1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                         )
AMAZON.COM, INC.,                        )        No. C09-0681RSL
                                         )
                    Plaintiff,           )
         v.                              )
                                         )        ORDER CONSTRUING CLAIMS
DISCOVERY COMMUNICATIONS, INC.,          )
                                         )
                    Defendant.           )
_____  )

      Plaintiff Amazon.com, Inc., is the owner of United States Patent No. 6,006,225

and United States Patent No. 6,169,986 (together "the search patents") which relate to a system

that helps a website user refine his search query by proposing additional query terms that, based

on historical query submissions, correlate with the original search terms.  Amazon.com also

owns United States Patent No. 6,266,649 and United States Patent No. 6,317,722 (together "the

recommendation patents") which relate to a system that filters information regarding the known

interests of a community of website users to generate personalized recommendations of items for

the user.  The parties disagree regarding the interpretation of eight concepts used in the claims of

the search and/or recommendation patents.

      The claims of the patent define the invention and the scope of the patentee's right

to exclude.  Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

The Supreme Court has determined that the proper construction of the asserted patent claims

ORDER CONSTRUING CLAIMS

1  must be decided by the Court as a matter of law.  Markman v. Westview Instruments, Inc., 517

2  U.S. 370, 384-91 (1996).  If a term must be construed, the Court focuses on how a person of

3  ordinary skill in the art at the time the patent application was filed would have understood the

4  terms in light of the entire patent.  Phillips v. AWH Corp., 415 F.3d 1303, 1321, 1323 (Fed. Cir.

5  2005).

6  It is the person of ordinary skill in the field of the invention through whose eyes
the claims are construed.  Such person is deemed to read the words used in the
7  patent documents with an understanding of their meaning in the field, and to have
8  knowledge of any special meaning and usage in the field.  The inventor's words
that are used to describe the invention -- the inventor's lexicography -- must be
9  understood and interpreted by the court as they would be understood and
10  interpreted by a person in that field of technology.  Thus the court starts the
decisionmaking process by reviewing the same resources as would that person,
11  viz., the patent specification and the prosecution history.

12  Phillips, 415 F.3d at 1313 (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473,

13  1477 (Fed. Cir. 1998)).

14       The Phillips decision sets out a framework for claim construction that synthesizes

15  prior law while rejecting the earlier tendency to over-emphasize extrinsic evidence.  The claims

16  themselves, rather than dictionaries, encyclopedias, and treatises, provide a context for the

17  contested terms and comparisons against which to measure the scope of the various claims.

18  Phillips, 415 F.3d at 1314-15.  Unless the meaning of the claim language is "readily apparent

19  even to lay judges" (Phillips, 415 F.3d at 1314), the court should "rely heavily" on the patentee's

20  written description of the invention (Phillips, 415 F.3d at 1317), giving the claims "their

21  broadest reasonable construction 'in light of the specification as it would be interpreted by one

22  of ordinary skill in the art'" (Phillips, 415 F.3d at 1316 (quoting In re Am. Acad. of Sci. Tech.

23  Ctr., 367 F.3d 1359, 1364 (Fed. Cir. 2004))).[1]  Other evidence of how the patentee and the PTO

24

25       [1] Defendant's reliance on Halliburton, 514 F.3d at 1253-54, for the proposition that ambiguous
26  claim language should always be construed narrowly is misplaced.  Halliburton involved a challenge to

ORDER CONSTRUING CLAIMS       -2-

1  understood the claims contained in the prosecution history can also inform the meaning of the

2  claim language, although the Federal Circuit warns that this resource sometimes lacks the clarity

3  of the patent itself.  <u>Phillips</u>, 415 F.3d at 1317.

4      When interpreting claim terms, district courts may also "rely on extrinsic evidence,

5  which 'consists of all evidence external to the patent and prosecution history, including expert

6  and inventor testimony, dictionaries, and learned treatises."  <u>Phillips</u>, 415 F.3d at 1317 (quoting

7  <u>Markman</u>, 52 F.3d at 980).  Such evidence is especially useful for helping the court understand

8  the underlying technology, explaining how an invention works, and establishing the way in

9  which one skilled in the art would use the claim terms.  <u>Phillips</u>, 415 F.3d at 1318.  Courts

10  should not, however, put too much emphasis on extrinsic evidence as the starting point for

11  construing claim terms because such evidence "is unlikely to result in a reliable interpretation of

12  patent claim scope unless considered in the context of the intrinsic evidence."  <u>Phillips</u>, 415 F.3d

13  at 1319.  The claim construction methodology set forth in <u>Texas Digital Sys., Inc. v. Telegenix,</u>

14  <u>Inc.</u>, 308 F.3d 1193 (Fed. Cir. 2002), which encouraged district courts to rely on dictionary

15  definitions when ascertaining the ordinary meaning of particular claim terms, with recourse to

16  the specification serving only as a check on the dictionary definition, was rejected.

17      The main problem with elevating the dictionary to such prominence is that it
18      focuses the inquiry on the abstract meaning of words rather than on the meaning of
    claim terms within the context of the patent.  Properly viewed, the "ordinary
19      meaning" of a claim term is its meaning to the ordinary artisan after reading the
    entire patent.  Yet heavy reliance on the dictionary divorced from the intrinsic
20      evidence risks transforming the meaning of the claim term to the artisan into the
21      meaning of the term in the abstract, out of its particular context, which is the
    specification.
22

23  ───────────────

24  the definiteness of the claims under 35 U.S.C. § 112, ¶ 2.  In the face of a definiteness problem, the
Federal Circuit is willing to adopt a narrow construction to stave off a finding of invalidity as long as
25  there is an enabling disclosure that satisfies the notice function of the claims as to the narrower
construction.  Where the patentee has particularly pointed out and distinctly claimed the subject matter
26  of his invention, however, he is entitled to the broadest reasonable construction of the claim terms.

ORDER CONSTRUING CLAIMS    -3-

1    Phillips, 415 F.3d at 1321.

2    In the interest of clarity, the Court will construe the disputed claims of the search

3    patents, then proceed to the disputed claims in the recommendation patents.  Having reviewed

4    the memoranda and exhibits submitted by the parties and having heard the arguments of counsel

5    on December 16, 2010, the Court finds as follows:

6                                    **Search Patents**

7    Many of the disputed terms are used throughout the search patents in various

8    formulations:  "refine," for example, also appears as "refining," "refinement," and

9    "refinements."  Because any construction ascribed to the disputed terms will have equal effect

10   throughout the various claims at issue, the Court starts with claim 1 of the '225 patent,

11   reproduced here with the disputed terms in italics:

12
13   1.  In a computer system that implements a search engine which is accessible to a
     community of users, a method of assisting users in *refining* search queries to enhance
     discovery, the method comprising the computer-implemented steps of:

14
15       (a) processing search queries submitted to the search engine by a plurality of users
16           over a period of time to generate *query term correlation data*, the *query
             term correlation data* reflecting frequencies with which query terms appear
17           together within the same search query;

18       (b) receiving a search query from a user, the search query including at least one
19           query term;

20       (c) using at least the *query term correlation data* to identify a plurality of
21           additional query terms that are deemed to be related to the at least one query
             term; and

22
23       (d) presenting the plurality of additional query terms to the user for selection to
             allow the user to *refine* the search query.

24
25
26

ORDER CONSTRUING CLAIMS                    -4-

1  **1. "Refine"**

2          The term "refine" is in dispute.[2]  Plaintiff argues that the term need not be

3  construed and that its widely accepted meaning should govern.  If construction is necessary,

4  plaintiff offers "introduce change intended to improve results."  Defendant argues that the term

5  "refine" should be construed as it is used in the claims and specification to mean "the addition of

6  one or more query terms to the original search query based on correlations between each term of

7  the search query and the additional query term or terms in a history of search queries received by

8  the search engine."

9          The Court will not incorporate into the term "refine" limitations regarding the

10  nature of the resulting query and/or the method by which the proposed refinements are

11  generated.  "Refine" is not defined in the claims or the specification.  It is a broad term

12  conveying the idea of change or alteration in a hopefully positive direction.  Concepts regarding

13  the outcome of the change or the method by which the change is made are logically separate

14  from the term "refine."  In fact, those concepts and limitations are presented elsewhere in the

15  claims.  Claim 10 of the '986 patent, for example, specifies that the refined search query will be

16  comprised of "all terms of the query submitted by the user and an additional term."

17  Incorporating the concept of an addition into the broader term "refine" would impose limitations

18  not inherent in the claim language or create redundancies.  See RF Del., Inc. v. Pac. Keystone

19  Techs., Inc., 326 F.3d 1255, 1263-64 (Fed. Cir. 2003).

20          The Court construes the term "refine" to mean "change or alter with the intent to

21  improve."

22

23  ────────────────────

24          [2]  In their "Joint Claim Construction and Prehearing Statement" (Dkt. 108), the parties identify
the phrase "refine the search query" as the subject of dispute.  The parties have, however, agreed that
25  "search query" should be construed as "term or string of terms for submission or submitted to a search
engine."  Because there is no dispute over the meaning of "the search query," the Court confines its
26  discussion to the term "refine."

ORDER CONSTRUING CLAIMS                    -5-

**2.   "Query Term"**

The parties disagree about whether a "query term" means only a single word or whether it also comprehends two or more individual words which, taken together, have a particular meaning.  The phrase is not defined in the patent.  Defendant maintains that because "the claims and common specification of the Amazon Search patents never use 'term' or 'query term' to refer to multiple words," the Court should construe "query term" as "an uninterrupted string of characters," *i.e.*, a single word.

The patentees chose to use the word "term," rather than "word," in the claims.  The ordinary meaning of "term" includes multi-word phrases that, taken together, convey a particular meaning.  "United States of America," for example, is more than simply the sum of its parts:  the four-word term conveys a meaning separate from "states," "united," and/or "America."  One of ordinary skill in the art would understand that correlation data can be collected and stored for multi-word terms as well as single-word terms.  The Court will not read into the claim a limitation that is merely suggested by the examples in the specification.

The Court construes the term "query term" to mean "a word or string of words which, taken together, convey a particular meaning."

**3.  "Correlation"**

As presented by the parties, the "correlation" dispute turns on whether the items being correlated are individual words, one to another, or strings of words.  The Court has already construed "query term:"  no other construction of "correlation" is necessary.  Because a "query term" can include two or more individual words which, taken together, have a particular meaning, "correlations" and the "correlation data" may reflect the frequency with which single- or multi-word terms appear together in the same search query.

**4. "Successful Query"**

Claim 3 of the '225 patent states:

3.  The method of claim 1, wherein the search query includes multiple query terms, and step (c) comprises the sub-steps of:

(c1) for each of the multiple query terms, identifying a set of terms that have previously occurred in combination with the respective query term within a *successful query*; and

(c2) selecting, as the additional terms, a set of terms that are common to all of the sets identified in step (c1).

The term "successful query" is in dispute.  The patentees, apparently realizing that "success" is an amorphous concept, explained what they considered a "successful query" in the specification. According to the inventors, a "successful query result" is a query submission that produces at least one match (Col. 2: ll. 42-46; Col. 4: ll. 18-22) or results in an item count that is greater than zero (Col. 9: ll. 50-55).  An "unsuccessful" query, on the other hand, is a query submission that produces a NULL result (*i.e.*, no responsive items).  Col. 9: ll. 44-55.  Based on these formulations, plaintiff argues that a successful query is one that produces a result in which the item count is greater than zero.

Defendant argues that there are material differences between the "at least one match" and the "item count greater than zero" formulations of "successful query."  In defendant's view, the "at least one match" language requires not only that a query generate an item count greater than zero, but also that the identified item have some sort of "logical nexus or meaningful relationship" to the terms in the query.  Dkt. # 117 at 11.  There is no support in either the claims or the specification for incorporating a qualitative element into the definition of "match."  The inventors used non-matching, NULL result, and zero items found as functional equivalents.  Col. 6: ll. 8-11 ("Thus, if any query term does not produce a match (referred to herein as a 'non-matching term'), the query will produce a NULL query result."); Col. 9: ll. 44-

45 ("NULL query result (items_found=0)").  For purposes of the '225 patent, a search that results in an item has generated a match.  Whether the item is logically correlated to the terms of the search query does not determine the success or failure of the search.

The Court construes the term "successful query" to mean "a query that produces a result in which the item count is greater than zero."

**Recommendation Patents**

As was the case with the search patents, many of the disputed terms are used throughout the recommendation patents in various formulations.  Because any construction ascribed to the disputed terms will have equal effect throughout the claims at issue, the Court starts with claim 1 of the '649 patent, reproduced here with the disputed terms in italics:

1.  In a multi-user computer system that provides user access to a database of items, a method of recommending items to a user, the method comprising the computer-implemented steps of:

(a) generating a *non-user-specific data structure* which maps individual items of the database to corresponding sets of *similar items* in which similarities between items are based at least upon the collective *item interests of a community of users*;

(b) identifying *items that are known to be of interest to the user*;

(c) for each of a plurality of the *items identified in step (b)*, accessing the data structure to identify a corresponding set of *similar terms*;

(d) combining the sets of *similar items* identified in step (c) to generate a combined set of additionally *similar items*; and

(e) recommending at least some of the *similar items* of the combined set generated in step (d) to the user;

wherein step (a) is performed in an *off-line mode*, and steps (b)-(e) are performed substantially in real time in response to an online action by the user.

ORDER CONSTRUING CLAIMS                    -8-

1   **5. "Items of Interest"**

2           In one section of their memoranda, the parties present a number of disparate terms

3   and phrases – "items that are known to be of interest to the user," "similar items," "item interests

4   of a community of users," and "related products" – for construction.  It is not clear what claim

5   term or concept is in dispute:  the claim language cited by the parties is not technical, nor are the

6   words combined in a way that is unusual or ambiguous.  In fact, defendant acknowledges that

7   "interests" is readily understood and needs no construction.  Dkt. # 113 at 18.  Defendant seems

8   to be arguing that, in order for an item to be "of interest" to a user or community of users, the

9   user or users must take some affirmative action, such as viewing, purchasing, or favorably rating

10  at item, to indicate that they in fact like or have an affinity for the item.

11          Although it is true that gaging user interest based on affirmative conduct is

12  probably the most accurate predictive method, it is not the only method disclosed.  The language

13  of claim 1 does not limit "interests" or "similarity" to express or affirmative indications of

14  interest in an item.  Nor would one skilled in the art, having read the words used in the patent

15  documents, understand that the invention requires that users take some action to make their

16  interests known.  The specification teaches that any source of information regarding a user's

17  liking of or affinity for an item, including the content of the user's credit card records and/or the

18  content of the "Favorites" list on the user's web browser, can be used to determine a user's

19  known interest for purposes of developing a list of recommended items.  Col. 8: ll. 38-49.[3]  The

20  specification also contemplates situations in which the items viewed, purchased, or favorably

21  rated by the user do not correspond with any database lists of similar items.  In such

22  circumstances, the recommendation service may be terminated or it "could attempt to identify

23  additional items of interest, such as by accessing other sources of interest information."  Col 10:

24  ────────────────

25          [3] At oral argument, defendant conceded that user interest could be determined by parsing credit
    card records and url "Favorites" lists, but argued that these sources fit within its proposed definitions
26  because they are actually based on the user's past actions, however distant and/or indirect.

1  ll. 46 - Col. 11; ll. 3.  The inventors specifically note that tables of similar items could be

2  generated based on purchasing and viewing histories, but they "could also reflect non-

3  collaborative type item similarities, including content-based similarities derived by comparing

4  item contents or descriptions."  Co. 9; ll. 12-15.  There is nothing in the claims or specification

5  that excludes from the scope of the patent an embodiment that provides a list of recommended

6  items based not on the user's affirmative actions, but only on information that was mined from

7  indirect sources.[4]

8        The terms "items of interest" and "similar items," standing alone, do not limit the

9  means by which interest or similarity can be measured or determined.  Such limitations are

10 imposed elsewhere in the claims.  Claim 8 of the '649 patent, for example, specifies that the

11 items of interest to the user are those that are currently in the user's shopping cart, while claim 9

12 utilizes items that were previously purchased by the user.  Incorporating these limitations into

13 the terms at issue here would either impose limitations that are not inherent in the claim

14 language or create redundancies.

15 **6. "Non-User-Specific Data Structure"**

16       The '649 patent claims a "non-user-specific data structure which maps individual

17 items of the database to corresponding sets of similar items in which similarities between items

18 are based at least upon the collective item interests of a community of users."  The parties agree

19 that the data structure cannot be generated for the purpose of providing recommendations to a

20 particular user.

21       Defendant argues that the "data structure" must be construed as a database, table,

22 or b-tree because those are the structures that are disclosed in the specification.  This proposed

23 limitation is not supported by the language of the claim or required by the specification.  The

24 _____

25  [4] Although claim 1 is written broadly enough that one skilled in the art would realize that
   various sources of information could be used to determine a user's interest in a particular item, that
26 interest must be "known" and not merely hypothesized or statistically predicted.

inventors generically describe the format in which the similar item data can be maintained. Although the specification discusses databases, tables, and b-trees, there is no indication that one skilled in the art would understand that the invention was limited to an embodiment which utilized one of those structures.  Plaintiff's invention – a method for generating personalized recommendations of items based on the collective interests of a community of users – in no way depends on the exact type of structure in which the data is kept, as one skilled in the art would have recognized in 1998.

Although the parties have not designated "based at least upon the collective item interests of a community of users" as a disputed term, they clearly disagree over the meaning of that phrase.  Plaintiff suggests that, because an item of interest can be ascertained using sources of information other than affirmative user actions, the non-user-specific data structure if claim 1 can be populated solely with content-based similarities (*i.e.*, data that is generated by comparing items without any reference to the interests of the community of users).  Defendant points out, however, that while content-based similarities can be included in the data structure, claim 1 specifically requires that community interests comprise at least part of the data populating the structure.  Plaintiff cannot ignore this limitation.[5]

**7. "Off-Line Mode"**

Pursuant to claim 1 of the '649 patent, the non-user-specific data structure discussed above is generated "in an off-line mode," while the other steps of the claim are "performed substantially in real time in response to an online action by the user."  Plaintiff argues that "off-line mode" imposes a temporal limitation:  the data structure must be generated prior to and independently of the presentation of recommendations to an individual user. Defendant, on the other hand, argues that the common industry definition of "off-line mode"

---

[5] The non-user-specific data structures of claim 33 of the '649 patent and claim 11 of the '722 patent, on the other hand, are not so limited and can apparently be generated based solely on content-based comparisons.

ORDER CONSTRUING CLAIMS                    -11-

involves a lack of connection between a computing device and a network or program, such that the term should be construed as "not connected to the computer on which the user performs an online action."

Read in the context of the claims and the specification, one skilled in the art would understand that the limitation includes both temporal and connectivity components. The term "off-line" would convey to one skilled in the art a computational separation, while the remainder of the phrase indicates a temporal separation. One of the highlighted benefits of the invention is that it separates "the relatively computation-intensive task of correlating item interests" from the generation of personal recommendations so that the latter task can be achieved rapidly and efficiently without sacrificing the breadth of the search for items in which the user might be interested. Col. 3: ll. 30-37. The Court therefore concludes that the generation of the non-user-specific data structure does not occur in response to an online action by the user and does not rely upon the computational power of the user's computing device. The data structure must, however, be available to the user's computer so that the data structure can be accessed as specified in claim 1(c).

**8. "Similarity Score"**

Claim 4 of the '649 patent is a dependent claim wherein the non-user-specific data structure of claim 1 involves the identification of popular items in the database and an analysis of a community's purchasing history to determine which other items are purchased along with the popular items. Claim 4 discloses the calculation of a "similarity score" for each pair of items (popular and other) "which reflects a number of users that purchased both the popular item and the other item relative to a number of users that purchased at least one of the popular items and the other item." Other claims of the '649 patent use different parameters or comparisons to calculate the "similarity score." Claims 5 and 17, for example, compare users' expressions of interest in each of the items in the pair, rather than actual purchases of those items. Claims 16 and 19 determine similarities and similarity scores "by at least analyzing historical data that

reflects item interests of a community of users."

Plaintiff argues that "similarity score" and its related phrases need not be construed and/or should be given their plain meaning of "a value or score reflecting a measure of similarity." Defendant argues that the term is indefinite because, absent some limitation establishing the parameters by which similarity should be measured, the resulting score could be completely arbitrary. The concept of similarity, while potentially debatable, is not insolubly ambiguous or without any reasonable meaning. Even if the term were problematic in the abstract, the inventors have provided methods by which to compare the pairs of items.

The Court construes "similarity score" to mean "a value or score reflecting a measure of similarity."[6]

It is so ORDERED.

Dated this 11th day of January, 2011.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

---

[6] Plaintiff further urges that a "similarity score" could be based on a comparison of the contents of two items, rather than the interests of a community of users. While this argument is theoretically true, none of the claims discussed by the parties teaches a content-based comparison. Claim 19, on which plaintiff relies for this argument, is dependent on claim 16, which discloses a process which determines similarities "based at least" on historical data regarding items of interest to the community of users. A measure of similarity based solely on the comparison of content, without reference to the interests of the community of users, would not fall within this claim.

ORDER CONSTRUING CLAIMS                    -13-